1
2
3
4
5
6
7
8     **IN THE UNITED STATES DISTRICT COURT FOR THE**
9         **EASTERN DISTRICT OF CALIFORNIA**
10
11   J & J SPORTS PRODUCTIONS, INC.,      )    1:10-cv-02087-AWI-JLT
                                          )
12              Plaintiff,                )    ORDER RE: MOTION FOR
                                          )    SUMMARY JUDGMENT
13        v.                              )
                                          )    (Doc. 41)
14   ARTURO M. FLORES and ALEJANDRO       )
     ALEX VAZQUEZ, individually and dba   )
15   LOS AMIGOS aka MARAKAS               )
     TROPICAL aka LA PLACITA,             )
16                                        )
                Defendants.               )
17   _____  )
                                          )
18   AND RELATED CROSS-ACTION             )
                                          )
19   _____  )
20
21                    **I. INTRODUCTION**
22
23   Defendants Arturo M. Flores and Alejandro Alex Vazquez move for summary judgment or summary
     adjudication in the alternative.  For reasons discussed below, summary judgment shall be granted.
24
25
26             **II. FACTS AND PROCEDURAL BACKGROUND**
27
28   The Court refers the parties to previous orders for a complete chronology of the proceedings.  On

November 9, 2010, plaintiff J & J Sports Productions, Inc. (hereinafter referred to as "Plaintiff")

filed its complaint against defendants Arturo M. Flores and Alejandro Alex Vazquez, individually

and dba Los Amigos aka Marakas Tropical aka La Placita (hereinafter referred to as "Defendants"),

asserting causes of action for (1) violation of section 605 of the Federal Communications Act of

1934, as amended (47 U.S.C. § 605), (2) violation of section 553 of the Federal Cable

Communications Policy Act of 1992, as amended (47 U.S.C. § 553), (3) conversion and (4) violation

of California's Unfair Competition Law (UCL), California Business and Professions Code Sections

17200 et seq.  In the complaint, Plaintiff alleged as follows:

> "Pursuant to contract, Plaintiff J & J Sports Productions, Inc., was granted the exclusive nationwide commercial distribution (closed-circuit) rights to *"Firepower": Manny Pacquiao v. Miguel Cotto, WBO Welterweight Championship Fight Program,* telecast nationwide on Saturday, November 14, 2009 (this included all under-card bouts and fight commentary encompassed in the television broadcast of the event, hereinafter referred to as the *"Program"*)."

Plaintiff further alleged:

> "Pursuant to contract, Plaintiff J & J Sports Productions, Inc., entered into subsequent sublicensing agreements with various commercial entities throughout North America, including entities within the State of California, by which it granted these entities limited sublicensing rights, specifically the rights to publicly exhibit the *Program* within their respective commercial establishments in the hospitality industry (i.e., hotels, racetracks, casinos, bars, taverns, restaurants, . . . , etc.)."

Plaintiff further alleged:

> "Plaintiff is informed and believes, and alleges thereon that Defendant, Arturo M. Flores, is an owner and/or operator, and/or licensee, and/or permitee, and/or person in charge, and/or an individual with dominion, control, oversight, and management of the commercial establishment doing business as Los Amigos a/k/a Marakas Tropical a/k/a La Placita operating at 8331 Kern Canyon Road, Space 34, Bakersfield, California 93306. [¶] Plaintiff is informed and believes, and alleges thereon that Defendant, Alejandro Alex Vazquez, is an owner, and/or operator, and/or licensee, and/or permitee, and/or person in charge, and/or an individual with dominion, control, oversight and management of the commercial establishment doing business as Los Amigos a/k/a Marakas Tropical a/k/a La Placita operating at 8331 Kern Canyon Road, Space 34, Bakersfield, California 93306."

Plaintiff further alleged:

> "With full knowledge that the *Program* was not to be intercepted, received, published, divulged, displayed, and/or exhibited by commercial entities unauthorized to do so, each and every of the above named Defendants and/or their agents, servants, workmen or employees did unlawfully intercept, receive, publish, divulge, display,

2

1  and/or exhibit the *Program* at the time of its transmission at their commercial
2  establishment in Bakersfield, California located at 8331 Kern Canyon Road, Space
   34, Bakersfield, California 93306."

3  On July 16, 2012, Defendants filed a motion for summary judgment or summary adjudication in the

4  alternative, contending there are no triable issues of material fact and Defendants are entitled to

5  judgment as a matter of law.  On August 6, 2012, Plaintiff filed its opposition to Defendants' motion.

6  On August 13, 2012, Defendants filed their reply to Plaintiff's opposition.

7

8                                    **III. LEGAL STANDARD**

9

10  "A party may move for summary judgment, identifying each claim or defense – or the part of each

11  claim or defense – on which summary judgment is sought.  The court shall grant summary judgment

12  if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled

13  to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden

14  of "informing the district court of the basis for its motion, and identifying those portions of 'the

15  pleadings, depositions, answers to interrogatories, and admissions on file, together with the

16  affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."

17  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see* Fed. R. Civ.

18  P. 56(c)(1)(A).  "Where the non-moving party bears the burden of proof at trial, the moving party

19  need only prove that there is an absence of evidence to support the non-moving party's case."  *In re*

20  *Oracle Corp. Securities Litigation,* 627 F.3d 376, 387 (2010) (citing *Celotex, supra,* at p. 325).  If

21  the moving party meets its initial burden, the burden shifts to the non-moving party to present

22  evidence establishing the existence of a genuine dispute as to any material fact.  *See Matsushita Elec.*

23  *Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538.  A

24  court ruling on a motion for summary judgment must construe all facts and inferences in the light

25  most favorable to the non-moving party.  *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255,

26  106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  Even if the motion is unopposed, the movant is not

27

28                                              3

absolved of the burden to show there are no genuine issues of material fact, *Henry v. Gill Industries,*
*Inc.,* 983 F.2d 943, 949-50 (9th Cir. 1993), although the court may assume the movant's assertions
of fact to be undisputed for the purposes of the motion and grant summary judgment if the facts and
other supporting materials show the movant is entitled to it.  *See* Fed. R. Civ. P. 56(e)(2), (3).

## IV. DISCUSSION

***A. The section 605 claim*** – As a threshold matter, Defendants move for summary adjudication of
the section 605 claim, contending adjudication in their favor must be granted because no evidence
suggests they could be found individually liable under the legal standards applicable to television
signal piracy cases.  Section 605 prohibits the unauthorized interception and exhibition of closed-
circuit television programming, *see Kingvision Pay-Per-View, Ltd. v. Jasper Grocery,* 152 F.Supp.2d
438 (S.D.N.Y. 2001), and satellite-delivered programming.  *DirecTV, Inc. v. Webb,* 545 F.3d 837,
843 (9th Cir. 2008).  Subsection (a) of the statute provides in pertinent part: "[N]o person receiving,
assisting in receiving, transmitting, or assisting in transmitting, any interstate or foreign
communication by wire or radio shall divulge or publish the existence, contents, substance, purport,
effect, or meaning thereof, except through authorized channels of transmission or reception, (1) to
any person other than the addressee, his agent, or attorney . . . . No person not being authorized by
the sender shall intercept any radio communication and divulge or publish the existence, contents,
. . . or meaning of such intercepted communication to any person." 47 U.S.C. § 605(a).  "Any person
aggrieved by a violation of subsection (a)" may bring a civil action for actual or statutory damages
for each violation.  47 U.S.C. § 605(e)(3)(C).  "Any person aggrieved" includes "any person with
proprietary rights in the intercepted communication."  47 U.S.C. § 605(b)(6).  Relying principally
on *J & J Sports Productions, Inc. v. 291 Bar & Lounge, LLC,* 648 F.Supp.2d 469 (E.D.N.Y. 2009),
which held individual liability under the Federal Communications Act "[r]equires that the individual
authorize the underlying violations," *id.* at 473, Defendants contend issues of material fact could

4

1    arise only if the evidence suggested they "had a 'right and ability to supervise' the violations, as well

2    as an obvious and direct financial interest in the misconduct." *Id*. Flores testifies in his declaration:

> "At the time of the events giving rise to this lawsuit co-defendant Alejandro Alex Vazquez and I owned a swap meet on the subject premises, located at 8331 Kern Canyon Road, Bakersfield, CA 93306. The swap meet included 80 different independent businesses at that time. I had no direct or indirect control over any television programs that any one of these individual businesses and/or their owners or employees may have exhibited at this location. With specific reference to the subject fight program, "Firepower": Manny Pacquiao v. Miguel Cotto, WBO Welterweight Championship Fight Program, on Saturday, November 14, 2009, I had no advance notice that the television program was going to be exhibited at my property. I did not give my consent or permission for anyone to display that program and I did not even know it was going to be done."

9    Flores further testifies:

> "I was also not personally present when the fight program was allegedly displayed and I did not personally gain any money whatsoever by the exhibition. I did not derive any kind of benefit from the alleged signal piracy, certainly not any direct financial gain from the violation. [¶] The numerous independent businesses that operate at this swap meet location are independent businesses, and I am not their supervisor or boss. In other words, they are not my employees or agents and I do not have supervisory control over everything that they do, certainly not everything that each individual business decides to display on a television."

14    Flores further testifies:

> "Although I was not personally present during the alleged exhibition of the subject fight program, to my knowledge I do not believe there was any promotional advertising for the event. Based upon my investigation after the fact, I have been informed there was no cover charge, very few people present to watch the event, and no premium was charged for food or beverages. To my knowledge, I also do not believe this was a repeated occurrence, and it is my understanding that there was hardly [ ], if any, profit that was made from this event (and if there was any profit it was not realized by me)."

20    Vazquez submits his own declaration essentially corroborating Flores's testimony. Based on their

21    declarations, Defendants now contend the evidence shows they did not have either the right or ability

22    to supervise the allegedly unauthorized interception and exhibition of *The Program* by the swap

23    meet's vendors nor any obvious or direct financial interest in such interception and exhibition, and

24    therefore cannot be found liable under section 605. Inasmuch as Defendants seek to meet their initial

25    burden on summary judgment pursuant to the abovementioned standard, the Court does not agree.

26       The Eastern District of New York standard invoked by Defendants – that an individual must

5

1  have had (1) the right and ability to supervise a section 605 violation and (2) a financial interest in

2  the violation itself – applies to the question of whether a *corporate* defendant may be held

3  vicariously liable for a violation in his or her individual capacity and as an officer or director of the

4  corporation when *the corporation*, not the individual, is alleged to have committed the violation.

5  *See, e.g., J & J Sports Productions, Inc. v. Ribeiro,* 562 F.Supp.2d 498, 501 (S.D.N.Y. 2008).   As

6  it pertains to section 605 claims, this standard appears to have had its genesis in *National Satellite*

7  *Sports, Inc. v. J.A. Rocks, Inc.,* 2006 WL 1831332 (E.D.N.Y. 2006) (unpublished) at *3, which

8  borrowed the standard governing a corporate defendant's liability for vicarious and contributory

9  copyright infringement established by the Second Circuit in *Softel, Inc. v. Dragon Medical and*

10  *Scientific Communications, Inc.,* 118 F.3d 955, 971 (2d Cir. 1997).   *Softel* in turn relied on *Shapiro,*

11  *Bernstein & Co. v. H.L. Green Co.,* 316 F.2d 304 (2d Cir. 1963) (*Shapiro*), which held a chain store

12  could be found vicariously liable for copyright infringement through the sale of "bootleg" records

13  by the store's record department concessionaire where the store "retained the ultimate right of

14  supervision over the conduct of the record concession" and "reserv[ed] for itself a proportionate

15  share of the gross receipts from [the concessionaire's] sales of phonograph records." *Id*. at 308.   The

16  court concluded, "When the right and ability to supervise coalesce with an obvious and direct

17  financial interest in the exploitation of copyright materials – even in the absence of actual knowledge

18  that the copyright monopoly is being impaired, [citations] – the purposes of copyright law may be

19  best effectuated by the imposition of liability upon the beneficiary of that exploitation." *Id*. at 307.

20      Requiring a plaintiff to plead and prove supervision and direct financial interest before

21  individual liability may be imposed on a corporate actor for a section 605 violation allegedly

22  committed on behalf of the corporation is reasonable given the nature of the corporate form.

23  "Directors or officers of a corporation do not incur personal liability for torts of the corporation

24  merely by reason of their official position, unless they participate in the wrong or authorize or direct

25  that it be done." *United States Liab. Ins. Co. v. Haidinger-Hayes, Inc.,* 1 Cal.3d 586, 595, 83

26  Cal.Rptr. 418, 463 P.2d 770 (1970).   "Their liability, if any, stems from their own tortious conduct,"

27

28                                                          6

1   which "may be shown not solely by direct action but also by knowing consent to or approval of

2   unlawful action." *PMC, Inc. v. Kadisha,* 78 Cal.App.4th 1368, 1379, 1380, 93 Cal.Rptr.2d 663

3   (2000) (citing *Frances T. v. Village Green Owners Assn.,* 42 Cal.3d 490, 503-504, 229 Cal.Rptr.

4   456, 723 P.2d 573 (1986)).  In this case, however, the swap meet is not a corporation and Defendants

5   are not officers or directors.  According to the complaint, both Flores and Vazquez are alleged to

6   have been *doing business as* the swap meet where *The Program* was allegedly exhibited without

7   authorization.  "The designation of 'DBA' or 'doing business as' simply indicates [an entity]

8   operates under a fictitious business name. [Citation.] Use of a fictitious business name does not

9   create a separate legal entity." *Pinkerton's, Inc. v. Superior Court,* 49 Cal.App.4th 1342, 1348, 57

10  Cal.Rptr.2d 356 (1996); *accord Providence Washington Ins. Co. v. Valley Forge Ins. Co.,* 42

11  Cal.App.4th 1194, 1200, 50 Cal.Rptr.2d 192 (1996) ("The designation 'd/b/a' means 'doing business

12  as' but is merely descriptive of the person or corporation who does business under some other name.

13  Doing business under another name does not create an entity distinct from the person operating the

14  business.  The business name is a fiction, and so too is any implication that the business is a legal

15  entity separate from its owner") (internal citations, quotations omitted).  Defendants have provided

16  no argument or evidence to controvert the "doing business as" allegation, nor any argument to

17  suggest the swap meet had some sort of partnership, corporate or other business status *of the type*

18  that could conceivably insulate Defendants from individual liability for the misconduct allegedly

19  committed by the business.[1]  Defendants also concede in their respective declarations that they are

20  ────────────────

21      [1] In his declaration, Vazquez testifies that "[a]t the time of the events giving rise to this
    lawsuit, specifically November 14, 2009," he and Flores "were in the process of dissolving our
22  partnership that owned [the] swap meet[.]"  Vazquez further testifies, "The date of the agreement
    to dissolve the partnership was October 24, 2009, before this subject incident, and on November 1,
23  2009, Arturo Flores paid me the agreed-upon money to purchase my interest in this partnership
    business . . . . [T]hat instrument was not recorded until January of 2010, pursuant to the partnership
24  dissolution and settlement agreement between co-defendant Arturo Flores and I."  This suggests the
    swap meet might have been organized as a partnership.  Problematically for Defendants, no
25  argument or evidence has been provided to explain what type of partnership it was.  Therefore, the
    Court cannot presume it was anything more than a general partnership, and certainly not a limited
26  partnership as Defendants' argument appears to presuppose.  Although "[a] partnership is an entity

27

28                                              7

1   (or were, in Vazquez's case) owners of the swap meet.  Under these circumstances, Defendants are

2   legally indistinguishable from the swap meet.  As a result, evidence sufficient to create a genuine

3   issue of material fact as to the swap meet's liability automatically creates a genuine issue of material

4   fact as to Defendants' individual liability, without the need for a concomitant showing Defendants

5   had the right and ability to supervise the violation and an obvious and direct financial interest in it.

6   Therefore, Defendants' contention they did not have such right or interest is not ground for summary

7   adjudication *on the narrow question of their individual liability* for the section 605 cause of action.

8       The critical question here is not whether Defendants could be found individually liable for

9   the swap meet's misconduct, but whether the swap meet (and, by extension, Defendants) could be

10  found liable for a section 605 violation allegedly occurring on the swap meet's premises.  Having

11  reviewed the pleadings of record and all competent and admissible evidence submitted, the Court

12  first finds no genuine issue of material fact as to the swap meet's *direct* liability under section 605.

13  Defendants point to a complete absence of evidence in the record to suggest the unauthorized

14  interception and exhibition of *The Program* was committed by Defendants, and in its attempt to

15

_____

16  separate and apart from the partners of which it is comprised," *Everest Investors 8 v. McNeil
    Partners,* 114 Cal.App.4th 411, 424, 8 Cal.Rptr.3d 31 (2003), general partners are nevertheless

17  jointly and severally liable for the obligations of the partnership, Cal. Corp. Code, § 16306, subd.
    (a), including liability for misconduct committed by the partnership against third parties. *Id.*, §

18  16305, subd. (a); *Black v. Sullivan,* 48 Cal.App.3d 557, 569, 122 Cal.Rptr. 119 (1975).  In other

19  words, even assuming Defendants were operating in partnership and not simply doing business as
    the swap meet, it would be of no significance here. *But see* Cal. Corp. Code, § 16307, subd. (c) ("A

20  judgment against a partnership is not by itself a judgment against a partner.  A judgment against a
    partnership may not be satisfied from a partner's assets unless there is also a judgment against a

21  partnership").  The Court observes in any case that subject to certain exceptions not raised by

22  Defendants, "[e]very person who regularly transacts business in this state for profit under a fictitious
    business name shall . . . [¶] (a) File a fictitious business name statement[.]" Cal. Bus. & Prof. Code,

23  § 17910.  This includes a partnership doing business under a name that, as is apparently the case
    here, "does not include the surname of each general partner."  *Id*., § 17900, subd. (a).  Even if the

24  swap meet were a partnership, Defendants were likely doing business as the swap meet.

25

26

27

28                                              8

create a genuine issue of fact, Plaintiff adduces no competing argument or evidence other than to suggest Defendants could be held directly liable simply because *The Program* was exhibited at the swap meet.  Plaintiff has provided no authority – and the Court's research reveals no authority – to support this proposition.  Therefore, no reasonable trier of fact could find the swap meet directly liable.  Accordingly, to the extent Plaintiff seeks to hold Defendants directly liable under section 605, summary adjudication of this cause of action must be granted in favor of Defendants.  The question that in turn arises is whether there are additional theories under which the swap meet (and, by extension, Defendants) could be found liable for a section 605 violation that, even by Plaintiff's account, appears to have been committed by one of the swap meet's vendors.[2]  In the Court's view, *this* is a question on which law of vicarious and contributory copyright infringement *is* instructive.

*Fonovisa, Inc. v. Cherry Auction, Inc.,* 76 F.3d 259 (9th Cir. 1996), involved a plaintiff (Fonovisa) that owned copyrights to Latin music recordings and a defendant (Cherry Auction) that operated a swap meet in Fresno.  *Id.* at 261.  Vendors paid Cherry Auction a daily rental fee in exchange for booth space, and Cherry Auction supplied parking, conducted advertising and received an entrance fee from every customer who attended the swap meet.  In 1993, Fonovisa brought an action against Cherry Auction alleging it was vicariously and contributorily liable for infringement of Fonovisa's copyrights through its vendors' sales of counterfeit recordings.  The district court

---

[2] In a declaration dated November 23, 2009 and submitted with Plaintiff's June 16, 2011 motion for entry of default judgment, investigator Gilbert Tate testified on the night *The Program* was telecast, he observed it being shown on two projector screens at a bar in the swap meet called Marakas Tropical owned not by Defendants but by one Mario Perez.  Given undisputed evidence presumably in Plaintiff's possession *before* the complaint was filed shows Marakas Tropical was owned by Perez, it is unclear why Plaintiff alleged Defendants, not Perez, were doing business as Marakas Tropical.  Plaintiff provides no evidence even now to suggest Defendants have an ownership interest in Marakas Tropical.  On December 7, 2011, Defendants filed a cross-complaint against Mario German Benito Perez-Ramirez and Alma Toxqui, alleging the location within the swap meet where the interception and exhibition of *The Program* occurred was being leased to them.

granted Cherry Auction's motion to dismiss the complaint, finding plaintiffs like Fonovisa could not, as a matter of law, maintain such claims against swap meets for sales by vendors who were leasing their premises.  On appeal there was no dispute Cherry Auction was allegedly aware its vendors were selling counterfeit recordings in violation of Fonovisa's copyrights.  It was also undisputed Cherry Auction had the authority to exclude any vendor from its premises for any reason at any time.  *Id*.

The Ninth Circuit reversed.  *Fonovisa, supra,* 76 F.3d at 261, 265.  As to the claim for vicarious copyright infringement, the court focused on the issues of Cherry Auction's control of and financial benefit from its vendors' conduct, relying, like *Softel*, on the reasoning of *Shapiro* and a subsequent Second Circuit case entitled *Gershwin Publishing Corp. v. Columbia Artists Management, Inc.,* 443 F.2d 1159 (2d Cir. 1971), which reaffirmed the principle that "even in the absence of an employer-employee relationship one may be vicariously liable if he has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities."  *Id.* at 1162.  The *Fonovisa* court observed, "According to the complaint, Cherry Auction had the right to terminate vendors for any reason whatsoever and through that right had the ability to control the activities of vendors on the premises.  In addition, Cherry Auction promoted the swap meet and controlled the access of customers to the swap meet area.  In terms of control, the allegations before us are strikingly similar to those in *Shapiro* and *Gershwin*. [¶] . . . [¶] . . . H.L. Green's ability to police its concessionaire . . . parallels Cherry Auction's ability to police its vendors . . . . [¶] . . . As the promoter and organizer of the swap meet, Cherry Auction wields the same level of control over the direct infringers as did the *Gershwin* defendant . . . . [¶] The district court's dismissal of the vicarious liability claim in this case was therefore not justified on the ground that the complaint failed to allege sufficient control."  *Fonovisa, supra,* at p. 262-63.  The court further observed: "[Fonovisa's] allegations encompass many substantive benefits to Cherry Auction from the infringing sales.  These include the payment of a daily rental fee by each of the infringing vendors;

10

a direct payment to Cherry Auction by each customer in the form of an admission fee, and incidental payments for parking, food and other services by customers seeking to purchase infringing recordings. [¶] . . . The facts alleged by Fonovisa . . . reflect that [Cherry Auction] reap[s] substantial financial benefits from admission fees, concession stand sales and parking fees, all of which flow directly from customers who want to buy the counterfeit recordings at bargain basement prices. [Fonovisa] has sufficiently alleged direct financial benefit. [¶] . . . [T]he sale of pirated recordings at the Cherry Auction swap meet is a draw for customers." *Id*. at 263 (internal quotations omitted). Accordingly, the court found Fonovisa had stated a claim for vicarious copyright infringement. *Id.*

The court further found Fonovisa had stated a claim for contributory copyright infringement by alleging facts from which it could be inferred Cherry Auction had knowingly contributed to its vendors' misconduct: "The disputed issue is whether [Fonovisa] adequately alleged that Cherry Auction materially contributed to the infringing activity. We have little difficulty in holding that the allegations in this case are sufficient to show material contribution to the infringing activity. Indeed, it would be difficult for the infringing activity to take place in the massive quantities alleged without the support services provided by the swap meet. These services include, *inter alia*, the provision of space, utilities, parking, advertising, plumbing and customers. [¶] . . . Cherry Auction asks us to ignore all aspects of the enterprise described by the plaintiffs, to concentrate solely on the rental of space, and to hold that the swap meet provides nothing more. Yet Cherry Auction actively strives to provide the environment and the market for counterfeit recording sales. Its participation in the sales cannot be termed 'passive,' as Cherry Auction would prefer." *Fonovisa, supra,* 76 F.3d at 264. In reaching this conclusion, the court agreed with *Columbia Pictures Industries, Inc. v. Aveco, Inc.,* 800 F.2d 59 (3d Cir. 1986), "that providing the site and facilities for known infringing activity is sufficient to establish contributory liability." *Fonovisa, supra,* at p. 264. (*Aveco, Inc.,* held a video cassette rental business engaged in unauthorized public performances of copyrighted movies and

thereby contributorily infringed the copyright holders' right to authorize public performances of those movies under section 106 of the Copyright Act, 17 U.S.C. § 106, where it also made A/V rooms and equipment available to rental customers for non-home viewing.  800 F.2d at 64.)

Even though section 605 addresses only direct – but not vicarious or contributory – liability for the unauthorized interception and exhibition of closed-circuit television or satellite-delivered programming, at least six district courts have imported the vicarious and/or contributory copyright infringement law of the Second Circuit to section 605 claims against individual defendants.  *See, e.g., Joe Hand Promotions, Inc. v. Soviero,* slip copy, 2012 WL 3779224 (E.D.N.Y. 2012), at *9; *Joe Hand Promotions, Inc. v. Sorota,* slip copy, 2012 WL 2414035 (S.D.Fla. 2012), at *1-*2; *J & J Sports Productions, Inc. v. Arboleda,* 2009 WL 3490859 (M.D.Fla. 2009) (unpublished), at *5; *J & J Sports Productions, Inc. v. Brown,* 2009 WL 3157369 (W.D.Okla. 2009) (unpublished), at *3; *Ribeiro, supra,* 562 F.Supp.2d at 501 (S.D.N.Y. 2008); *J & J Sport Productions, Inc. v. Rosales,* 2008 WL 553292 (D.Colo. 2008) (unpublished), at *3.  Just as the foregoing courts viewed the copyright infringement law of the Second Circuit to be instructive on the cases before them, so, too, does this Court view the copyright infringement law of the Ninth Circuit – and *Fonovisa,* in particular – to be instructive on the case before it.  The Court, applying the *Fonovisa* standards in the section 605 context, concludes therefore that a swap meet may be held vicariously and/or contributorily liable for the unauthorized interception and exhibition of a closed-circuit television or satellite-delivered program allegedly committed on premises by one of its vendors.  For the swap meet to be held *vicariously* liable, the swap meet must have had the right and ability to police the conduct of its vendors and have acquired a direct financial interest in the interception and

12

exhibition.[3]  For the swap meet to be held *contributorily* liable, the swap meet must have either knowingly authorized the vendors' interception and exhibition or provided an environment and market for the interception and exhibition with knowledge such activity was or would be occurring.

Having reviewed the pleadings of record and all competent and admissible evidence submitted, the Court finds no genuine issue of material fact as to the swap meet's contributory liability.  Flores's and Vazquez's declarations establish they did not know *The Program* was going to be exhibited on the swap meet's premises; did not give their consent or permission for anyone to exhibit *The Program*; and were not personally present when the exhibition of *The Program* occurred. Plaintiffs offer no evidence in opposition to suggest Defendants knew or should have known the exhibition would be taking place, nor any evidence to suggest Defendants knew *other* unauthorized interceptions and exhibitions had been or were being committed by the swap meet's vendors.  In *Fonovisa*, for instance, it was alleged that in 1991, the Fresno County Sheriff's Department raided the Cherry Auction swap meet and confiscated thousands of counterfeit recordings.  76 F.3d at 261. It was further alleged that the following year, having discovered vendors were still selling counterfeit recordings, the department sent a letter notifying Cherry Auction the sales were ongoing.  *Id*.  The department also allegedly asked Cherry Auction to gather and share basic identifying information about each of its vendors.  *Id*. at 264.  These allegations suggested Cherry Auction was on notice of its vendors' infringing activity, and that even if it were not, it would have been after it ascertained what it was its vendors were selling.  There is nothing to suggest similar knowledge by Defendants. Under these circumstances, no reasonable trier of fact could conclude Defendants *knowingly*

---

[3] It appears in the end the standard for the swap meet's vicarious liability here will be nearly identical to the Eastern District of New York standard for corporate individual liability invoked by Defendants.  As should be evident from the Court's discussion, this result is due in part to the fact both *Fonovisa* and the Eastern District cases relied on some of the same Second Circuit authority.

13

authorized an interception and exhibition of *The Program* or provided an environment and market for the interception and exhibition with the *knowledge* that this or similar activity was or would be occurring. Because there is no evidence to suggest Defendants knew any activity in violation of section 605 was being conducted by the swap meet's vendors, Defendants cannot be found contributorily liable simply because they provided the site and facilities for their vendors to do business. Accordingly, to the extent Plaintiff seeks to hold Defendants contributorily liable under section 605, summary adjudication of this cause of action must be granted in favor of Defendants.

Having reviewed the pleadings of record and all competent and admissible evidence submitted, the Court further finds no genuine issue of material fact as to the swap meet's vicarious liability. Flores's and Vazquez's declarations further establish there were 80 independent vendors operating at the swap meet; that neither Flores nor Vazquez had any direct or indirect control over the television programs the vendors and/or their owners and employees may have been showing; and that neither Flores nor Vazquez derived any kind of benefit, financial or otherwise, from the interception and exhibition of *The Program*. Plaintiff offers no evidence to suggest Defendants had the right and ability to police the television programming of their vendors, nor any evidence to suggest Defendants acquired some direct financial benefit from the interception and exhibition of *The Program*. Thus, no reasonable trier of fact could find Defendants vicariously liable.

In its opposition, Plaintiff contends Defendants' testimony they did not have direct or indirect control over any television programs their vendors may have been showing is insufficient to meet their initial burden on summary judgment, arguing the element of control discussed by the relevant case law refers to control "in the sense of oversight, not physicality." Not so. "Control" implies a level of oversight *and* physicality, to borrow Plaintiff's terminology. Cherry Auction, the swap meet in *Fonovisa,* was alleged to have *patrolled* the location containing the booths occupied by its vendors, and it *controlled* customer access to this area. It also supplied parking for customers and

advertising for the vendors. 76 F.3d at 262. Equally important, Cherry Auction had a contractual agreement, briefly alluded to in the opinion, with each of the vendors. *Id*. at 263. The Ninth Circuit found this agreement analogous to the licensing agreement in *Shapiro*, *id*., which required the record concessionaire and its employees in that case to "abide by, observe and obey all rules and regulations promulgated from time to time" by the chain store, *Shapiro, supra,* 316 F.2d at 306 (internal quotations omitted), and further authorized the chain store to discharge any concessionaire employee "believed to be conducting himself improperly." *Id*. It was similarly alleged in *Fonovisa* that Cherry Auction had the right to terminate a vendor at any time for any reason. Based on the foregoing, the Ninth Circuit concluded Fonovisa had adequately alleged Cherry Auction retained the ability to *police* its vendors' activities in a manner sufficient to satisfy the control element. *Fonovisa, supra,* at p. 263. It is clear the Ninth Circuit reached this conclusion not merely because Cherry Auction was alleged to have had the ability to *oversee* its vendors' activities, as Plaintiff suggests, but because Cherry Auction was also alleged to have had the ability to *physically control* the instrumentalities by which its vendors operated. There is simply no evidence to suggest Defendants had the ability to exert the same level of control over their vendors as Cherry Auction had over its.

Plaintiff further suggests a genuine issue of material fact necessarily exists as to whether Defendants had a direct financial interest in the interception and exhibition of *The Program* despite their testimony to the contrary because Defendants, as owners and operators of the swap meet, would presumably have received a rental fee or some other form of remuneration from the infringing vendor in exchange for providing the vendor with a place to do business and ancillary business services (utilities, parking, advertising, etc.). Stated differently, Plaintiff suggests the ordinary business relationship between the vendor and the swap meet – and, more particularly, any money flowing from the vendor to the swap meet by virtue of that relationship – would be sufficient to satisfy the direct financial interest element. In the Court's view, this cannot be the case. If it were,

1  the issue of a swap meet's direct financial interest would be a moot point for the purpose of

2  determining liability. Instead, as *Fonovisa* illustrates, the swap meet must have had a direct financial

3  interest *in the infringing activity* to be found vicariously liable. This interest does not exist simply

4  because a swap meet receives monetary benefits from its vendors: Although a "direct financial

5  interest" in infringement may include more than just monetary benefits directly attributable to the

6  infringement, *see Fonovisa, supra,* 76 F.3d at 263, those benefits must nonetheless have had some

7  nexus to the alleged misconduct. *See id*. As noted above, it was alleged that the Fresno County

8  Sheriff's Department raided the Cherry Auction swap meet and confiscated thousands of counterfeit

9  recordings. 76 F.3d at 261. It was further alleged that the following year, having discovered vendors

10  were still selling counterfeit recordings, the department sent a letter notifying Cherry Auction the

11  sales were ongoing. Fonovisa also allegedly dispatched its own investigator to the swap meet, where

12  the investigator observed counterfeit sales. *Id*. These facts apparently led the *Fonovisa* court to infer

13  that customers who patronized the swap meet did so with the intention of "buy[ing] counterfeit

14  recordings at bargain basement prices." *Id*. at 263. Such facts, coupled with the allegations Cherry

15  Auction collected admission and parking fees and concession stand sales from customers, led the

16  court to conclude Cherry Auction derived "substantial benefits . . . from the infringing sales." *Id*.

17       It is evident from *Fonovisa* that determining whether Defendants might have had a direct

18  financial interest in the interception and exhibition of *The Program* depends on the nature of the

19  infringing vendor's business and what makes that business attractive to customers. This inquiry is

20  key because in *Fonovisa*, the *business* of the infringing vendors and the *infringing activity*, for which

21  the plaintiff sought to hold the defendant vicariously liable, were *one and the same*: the sale of

22  counterfeit musical recordings. In conjunction with the allegations made by the plaintiff, the most

23  compelling inference that arose given this circumstance was customers who attended the Cherry

24  Auction swap meet did so specifically for the purpose of buying counterfeit recordings. That is to

25

26

27

28                                                          16

say, customers had an interest in the infringement, and Cherry Auction's receipt of money vendors paid to set up shop and customers spent to attend the swap meet (i.e., from parking, admissions and concessions) naturally meant Cherry Auction had an interest in the infringement as well.  In this case, however, the business of the infringing vendor and the infringing activity are *not* the same.  The infringing activity is the allegedly unauthorized interception and exhibition of *The Program* by Defendants' vendor, Marakas Tropical.  But inasmuch as the evidence has been presented to the Court, Marakas Tropical operates a bar, and its business is presumably the sale of food and beverages, not the unauthorized viewing of closed-circuit telecasts.  Therefore, in contrast to the customers patronizing the Cherry Auction swap meet, who were seeking precisely to avail themselves of the infringement committed by the counterfeit vendors, it cannot be said customers patronizing Defendants' swap meet were seeking to avail themselves of any closed-circuit telecasts that might have been intercepted by Marakas Tropical.  While one might argue, reasonably, that customers patronize bars not solely for food and drink but also for entertainment, there is simply no evidence to suggest customers were drawn to the swap meet or to Marakas Tropical because of the prospect of watching *The Program*.  There is also nothing to suggest Marakas Tropical's exhibition of *The Program* "enhance[d] the attractiveness of [the swap meet] to potential customers." *Fonovisa, supra,* 76 F.3d at 263 (citing, *inter alia*, *Polygram v. Intern. Pub., Inc. v. Nevada/TIG, Inc.,* 855 F.Supp. 1314, 1332 (D.Mass. 1984)).  Under these circumstances, the connection between (a) any financial benefits Defendants might have received from customers patronizing the swap meet and (b) Marakas Tropical's interception and exhibition of *The Program* is speculative at best.

Accordingly, there can be no triable issue of material fact as to whether Defendants had the right and ability to police the conduct of their vendors or a direct financial interest in the interception and exhibition of *The Program*.  Therefore, to the extent Plaintiff seeks to hold Defendants vicariously liable under section 605, summary adjudication of this cause of action must be granted

17

in favor of Defendants.  Because summary adjudication has been granted in favor of Defendants as to theories of direct, vicarious and contributory liability under section 605, summary adjudication of the section 605 cause of action shall be granted in its entirety in favor of Defendants.

**B. The section 553 claim** – Defendants further move for summary adjudication of the second cause of action for violation of section 553 of the Federal Cable Communications Policy Act of 1992, as amended.  Section 553(a) provides in pertinent part: "(1) No person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law."  47 U.S.C. § 553(a)(1).  "Any person aggrieved by a violation of subsection (a)(1)" may bring a civil action for actual or statutory damages for each violation.  47 U.S.C. § 553(c)(3)(A). Having reviewed the pleadings of record and all competent and admissible evidence submitted, the Court first finds no genuine issue of material fact as to the swap meet's *direct* liability under section 553.  Defendants point to a complete absence of evidence in the record to suggest the unauthorized interception and/or reception of *The Program* was committed by Defendants, and in its attempt to create a genuine issue of fact, Plaintiff adduces no competing argument or evidence other than to suggest Defendants could be held directly liable simply because *The Program* appears to have been intercepted and shown at the swap meet.  Plaintiff has provided no authority – and the Court's research reveals no authority – to support this proposition.  Thus, no reasonable trier of fact could find the swap meet directly liable.  The Court further finds the same standards enunciated above for vicarious and contributory liability under section 605 apply equally to section 553.  Consistent with its analysis of Defendants' vicarious and contributory liability under section 605, the Court finds no triable issue of material fact as to Defendants' vicarious or contributory liability under section 553. Accordingly, summary adjudication of this cause of action must be granted in favor of Defendants.

*C. The conversion claim* – Defendants further move for summary adjudication of the third cause of action for conversion, which asserts Defendant's alleged misappropriation of *The Program* constituted conversion.  In California, conversion is "the wrongful exercise of dominion over" property belonging to another. *Burlesci v. Petersen,* 68 Cal.App.4th 1062, 1066, 80 Cal.Rptr.2d 704 (1998).  The elements of conversion are "(1) the plaintiff's ownership or right to possession of personal property, (2) the defendant's disposition of the property in a manner that is inconsistent with the plaintiff's property rights; and (3) resulting damages." *Fremont Indemnity Co. v. Fremont General Corp.,* 148 Cal.App.4th 97, 119, 55 Cal.Rptr.3d 621 (2007).  Intangible personal property such as television signals may be the subject of a conversion action.  See *Don King Productions/Kingvision v. Lovato,* 911 F.Supp. 419, 423 (N.D.Cal. 1995).  The claim here is predicated on the alleged violations of sections 605 and 553, in that Plaintiff contends Defendants' statutory violations constituted a disposition of *The Program* in a manner inconsistent with Plaintiff's rights in *The Program*.  Defendants, however, have succeeded in obtaining summary adjudication of the sections 605 and 553 claims.  Because the underlying claims no longer remain, summary adjudication of the conversion claim must be granted in favor of Defendants.

*D. The UCL claim* – Defendants further move for summary adjudication of the fourth cause of action for violation of the UCL.  "In order to state a claim for a violation of the [UCL], a plaintiff must allege that the defendant committed a business act that is either fraudulent, unlawful, or unfair." *Levine v. Blue Shield of California,* 189 Cal.App.4th 1117, 1136, 117 Cal.Rptr.3d 262 (2010).  The UCL "protect[s] both consumers and competitors by promoting fair competition in commercial markets for goods and services." *Kasky v. Nike, Inc.,* 27 Cal.4th 939, 949, 119 Cal.Rptr.2d 296, 45 P.3d 243 (2002).  " 'Because [the UCL] is written in the disjunctive, it establishes three varieties of unfair competition – acts or practices which are unlawful, or unfair, or fraudulent.  "In other words,

19

a practice is prohibited as 'unfair' or 'deceptive' even if not 'unlawful' and vice versa.' ' " *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.,* 20 Cal.4th 163, 180, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999).  Plaintiff asserts this claim under the UCL's unlawful prong.  An unlawful business practice is one that " 'is forbidden by any law,' " *Olszewski v. Scripps Health,* 30 Cal.4th 798, 827, 135 Cal.Rptr.2d 1, 69 P.3d 927 (2003), and "[v]irtually any law – federal, state or local – can serve as a predicate for a section 17200 action," *State Farm Fire & Casualty Co. v. Superior Court,* 45 Cal.App.4th 1093, 1102-03, 53 Cal.Rptr.2d 229 (1996) (abrogated on other grounds by *Cel-Tech Communications, Inc., supra,* 20 Cal.4th at 180).  The predicates for the UCL claim are the sections 605, 553 and conversion claims. Given Defendants have obtained summary adjudication of those claim, summary adjudication of the UCL claim must also be granted in favor of Defendants.

# V. DISPOSITION

Based on the foregoing, Defendants' motion for summary judgment is GRANTED.

Defendants shall recover all allowable costs from Plaintiff as the prevailing party in this action.  *See* Fed. R. Civ. P. 54(d).  Because the Ninth Circuit has interpreted the attorneys' fees provision of the Federal Communications Act, 47 U.S.C. § 605(e)(3)(B)(iii), to be a reciprocal provision that allows the district court to award attorneys' fees not only to an aggrieved party who prevails under the statute but also to a prevailing defendant, *see Echostar Satellite Corp. v. NDS Group PLC,* 390 Fed.Appx. 764, 767-78 (9th Cir. 2010) (unpublished), the Court further exercises its discretion to award attorneys' fees to Defendants and against Plaintiff.  Defendants may file a formal motion for attorneys' fees with supporting documentation within thirty (30) days of entry of this order.

All future dates are hereby VACATED.  The Court respectfully directs the Clerk of Court to terminate the pending motion to vacate the pre-trial conference and trial dates (doc. 56).

IT IS SO ORDERED.

Dated:    December 17, 2012     _____

                                           UNITED STATES DISTRICT JUDGE